May I proceed? Good morning. My name is Dan Mullen. I represent Admiral Insurance Company. And I'd like to reserve five minutes for rebuttal, if I may. This case is a question of whether or not minor modifications to a commercial can circumvent the known loss doctrine and an exclusion in an insurance policy relating to prior publications. I just want to emphasize to the Court the standard of review we're here on, and that is de novo review, and also the fact that the trial court was required to consider all of the evidence and all the inferences favorable to Admiral Insurance before it ruled. It's our position that the trial court erred in not taking into context the commercials that are at issue here. Did the trial court view the commercials? We do not know. The motions were – our motion on known loss was submitted and heard without oral argument. We have no idea. You filed the exhibits of the tapes of the – Those were all submitted to the court. District court. Yes. All of the motions that are before the Court today were all before the district court at one time, and rulings came out without oral argument. Let's talk about your known loss argument first for a minute. And that kind of interests me a bit. Now, there's no real dispute here that before they bought the added insurance, the $3 million policy, that they had already been notified of their prior ads. I guess it was the 97 ads. Correct. And they had received a letter from Soloflex. Yes. Putting them on notice that Soloflex felt that their prior ads had been, you know, infringing and trade dress claims and whatnot. Correct. Now, I gather – and it's a little bit unclear to me, but I gather they stopped showing those particular ads. That's not true, Your Honor. Not true? Okay. Hold on. Now, they then buy the added insurance. Correct. Correct? And then in 98, they change the ad and show the new ads on TV. And, you know, we can quibble about whether they're similar or whether they're different, but they do make some changes. They made some changes. Right. That's true. Okay. So, you know, the known loss is also referred to as the loss in progress. Correct. So what are the predicate acts for the loss – for this known loss? The predicate acts – What is it that kicks in the known loss doctrine here? What kicks in the known loss doctrine, our Supreme Court, Washington Supreme Court, has stated exactly what an insurance company must prove in order to establish known loss. And that is that the insured knew with a substantial probability the loss will occur. Subjective test. Subjective test. And the Supreme Court approved an instruction. And that instruction in the PUD case said if the insured knew that the bondholders would sue them for security violations, they're out. There's no coverage. The question in the PUD was whether or not they knew who was going to sue them and for what. And they didn't know at that time because the Washington Supreme Court had not invalidated those participant agreements that were involved in the nuclear projects. So there was no way they could know. And the jury found that way. Here – so the predicate here is did Bowflex know? Was it on notice that it had engaged in activity that it would be sued for? Well, once they received the letter, had they shown the same ad, the 97 ad, after they bought your insurance, I think that's an easy case. Now, as I understand the whole claim here is they didn't show that for purposes of the known loss doctrine. I don't put the other issue aside, the first publication rule aside for a moment. Yes. But for purposes of the known loss doctrine, they did not show – as I understand it, you can correct me if I'm wrong, if I'm misreading the record. But as I understand it, they did not continue to show the same 97 ad after they bought your insurance. They did. They did. They did. Just a quick sequence. Okay. They make the commercials in the fall of 1997. Randy Potter, he's the beefy guy that was in the commercials. We've seen the video. Okay. We've seen the video. All right. We can assure you many times. When he – he was the Bowflex man that was hired by Bowflex, put in charge of marketing to make these ads. And he puts the ads together, and he's concerned, and he goes to the CEO of Bowflex, and he says, I think they may be too similar. And I have the deposition testimony of Mr. Cook, who's the CEO of Bowflex, and he says, no, no, we looked at the whole context of those, and we said they weren't similar. And next – and then he approved the publication of those ads in the fall of 97. So, okay, just so that I understand. So, and then in November of 97, Soloflux sends its demand letter, and thereafter applies for and gets triple its insurance coverage from Admiral. Did Bowflex inform Admiral of the Soloflux demand letter? No. Is that a dispute in the record or not? It's not a dispute. Okay. They did not inform you of the demand letter at all? No. Okay. So are they still doing the 97 commercials at the time that they're applying for this coverage? Yes. Okay. When do they switch? When do they modify them? The modifications were done in August of 98. Okay. The demand letter's November of 1997. They've already started to publish these commercials. And Soloflux is not just a letter, it's a demand. Right. This isn't just this letter. Yes. Right. Very strong. And they respond back. Bowflex responds back December 1st. December 4th, 1997, Randy Potter meets, there's an internal memo random. They start working on some changes to these. I need Richard to record the statements while we're here. And they're statements of changing your body's hidden potential, body's hidden ability, unlock your potential. The statements are alternative openings for the Power Rod 60 second spot. I do not want to make the changes as of yet. I'm just getting it recorded while it's convenient. Also, I'll need Richard to not disclose the fact that he recorded these statements at this time. This is right after they wrote to Soloflux. And they didn't do another thing after this. They hoped Soloflux would just go away. After this, right after this, at the end of December, 97, they applied for Admiral's Insurance. Admiral's Insurance included an application requesting them to identify any claims or any circumstances that will lead to a claim. And they had a couple on there, but did not mention the Soloflux demand letter at all. And then the Admiral Insurance was issued in May, I'm sorry, in March of 1998. Soloflux sues in May of 1998. Between December and March, did they continue to? They're continuing on with these commercials. And after they're sued, they get together and decide to make some minor modifications. Now, these modifications, I think it's what the case is about. I think they're a factual question. In order to determine whether or not a commercial is the same or similar, it requires weighing it or reviewing it. For what our position is, if you actually look at those commercials and you take it in context of what we're talking about, no reasonable mind could come to a different result than that these are essentially the same commercials. Now, what was the theory of the suit between Soloflux and Direct Focus? Was that trade drafts? Pardon? What was the theory, legal theory, of the lawsuit? The main theory was trade draft violations, that they were trading on the goodwill of Soloflux, that they had essentially stolen their advertising ideas, which included the slogans which were issued, that they tried to change. They had no look and feel of the commercials. Correct. And we submitted in our summary judgment materials the affidavit of Soloflux's attorney. And it's part of the record here. And Soloflux's attorney talks about the fact what his demand letter meant and so forth. But he talks about the 98 changes as well. And he states, his name is Mr. Larson, he's the one who wrote the demand letter initially. Soloflux did not view the 1998 version of the commercials as new or different violations, but simply a continuing violation using the same advertising materials. In fact, if anything, Soloflux viewed these slight text modifications as an admission by Bowflex that they were engaging in wrongful conduct and violating Soloflux's rights. This is the part that I want to emphasize. It is important to keep in mind that the commercials aired after August 1998 were visually identical and still had the same feeling Soloflux had worked so hard in developing as part of its image. The commercials aired after August of 1998 continued to misappropriate the look and feel of Soloflux's advertising and were viewed as a continuation of Bowflex's 97 advertising materials. This is reflected in the fact Soloflux did not make any changes in its claims against Bowflex when it filed its first and second amended complaints that had nothing to do with the changes referred to above. The district court, I think, erred in reviewing this, assuming that Soloflux had actually made additional claims related to the 1998 modifications. There is nothing to support that. In fact, the only evidence in this record is Soloflux's attorney affidavit, which says the 98 are simply a continuation. We didn't add anything. We looked at it as a continuing violation. So the continuing loss, the purpose of the known loss doctrine was simply this commercial advertisement. Yes. That continued on after 97 on through into 98. And it's important, I think, to distinguish between known loss and prior publication on that point. Yes. Let's turn to prior publication for a minute, or first publication, and the terms of the policy, because this is an insurance coverage dispute. Correct. And, you know, when you go to the provision at issue here in the policy, it says this insurance does not apply to advertising injury arising out of oral or written publication of material. Correct. It doesn't say identical material. It doesn't say similar material. It just says material whose first publication took place before the beginning of the policy period. That seems to me a bit ambiguous. Well, I don't think it is. Why not? Because if it is ambiguous, then you go to Washington's, you know, policy of Washington law for how you interpret ambiguous terms of an insurance policy, and any ambiguity gets resolved in favor of the insurer. I think the Ringler case out of California, which was cited to the Court, helps address that issue. They specifically deal with an identical exclusion. It didn't have the words same or similar in it, and decided the case on the issue of material. They specifically looked at it. Is that an insurance coverage case? Yes. Ringler — I forget who the insurance company is, but Ringler Associates was sued for defamation. And the question was whether they — see, they changed — there was an argument that the defamation against Ringler changed later during the policy period. And the essence of the Court's opinion is when you look at it, defamation, just like trade dress, it's not the specific replication of exactly the same words. It is looking at the gist, the sting of the defamation. Well, trade dress is the same way. The material that we are covering is misappropriation of advertising ideas. Misappropriation of advertising ideas can cover trade dress, and trade dress is a look and feel. So when you go to the look and feel aspects, the material that was published that would be covered under Admiral's policy, absent the exclusion, you find that it's essentially the same. It's the same look and feel. And I want to dovetail that back to the known laws because I think it's critical. When they do this commercial, they make one or two word changes. Now, we can see that in the text. When you view the commercials, Potter is still standing there with his shirt off. Everything that Soloflex complained of was still in those commercials. The main thing, in their settlement documents, for example, their settlement document with Bowflex referenced a trade and feel allegation. That's what they were settling. That's what they paid $8 million for. And they knew when they released the commercial, they didn't change his taking the shirt off. They didn't change any of the visuals. In fact, Potter himself. Didn't they change some of the – who was speaking? Wasn't there an over – in the 98 version of it, is Potter actually doing the – is actually speaking? No, they have an actor that does the over voice. When Potter was deposed, we showed him the videos during a break in the deposition. And this is his testimony. Would there be anyone else at direct focus that would have more knowledge about what's on these commercials than you and your opinion? I don't think so. Well, let's look at Exhibit 62 again. That's one of the commercials. I'll ask the question again. Having reviewed those over the break, the difference between the 97 and 98 version of that commercial, were there any visual changes in the commercials? None that I could observe with my human eyes. If you put them in the edit booth, I bet you'll find some. And do you think that a customer, a potential customer, watching those two commercials would detect any visual changes? I can't speculate. We also submitted to the district court expert testimony on this issue. And again, the context of that, I think, is very important. Mr. Hatt was an advertising expert who reviewed this – these materials, and he points out that these – you've got to remember the medium and context of what you're talking about here. These are visual commercials, not just the text themselves. Let me ask you this. If we were to even – let's just assume for a moment. I don't know how this is going to come out yet. But even if I were to agree with you about your interpretation of the policy, is it nonetheless still a question of fact for a jury to decide whether they're similar or not? It could be, but I don't think it is in this case. Why not? Because when you take – when you take a look at the commercials, the question is whether or not a reasonable mind could find that they are new or different. And I don't think, when you look in context, that you can find that they're different. The other is known loss. It makes no difference if there's slight variations because – I'm not talking about – known loss is a different doctrine as far as I'm concerned. Correct. But it takes out the changes as well. I mean, they knew, Potter knew, when he made those changes, that he was still going ahead with commercials that were objectionable to Soloflex. He knew it. He knew it. Why? Not just because of the demand letter. They'd already been sued on this issue. And he still goes ahead with that commercial. Okay. I'd like to reserve the time that I have left if that's fine. Okay. Thank you. Good morning. May it please the Court, I'm Don Skarabostri here on behalf of the Athlete Direct Focus. I want to pick up on a couple of remarks the counsel raised. The record is actually silent as to when the 1997 ads were taken off the air. The record does support that they weren't taken off the air immediately in response to the cease and desist letter. The record also shows that the August 8, 1998 ads were put in place then. So there is an open question in the record as to whether there was some gap between when the old ads went off and the new ads came in. They're easily discernible. Well, you're the counsel. Which is it? Were they showing or not? I actually don't know. It's not on the record, and I don't know. Record. What's that? What do you mean there's a gap in the record? In other words, the deposition testimony and the documents don't show, to my knowledge, when the 1997 ads stopped in the 1990s. Well, when did they stop? I don't know. You don't know? Right now, I don't know. Nobody knows at the Direct Focus when they placed ads with the various TV stations? Oh, they know. No, I'm just saying it's not in the deposition transcripts and it's not in the documents that I'm aware of. Well, then it sounds like there's a real question of fact here about that. No, there's not. Why not? Because the issue is the August 1998 ads, and they didn't stop. That is clear in the record. They didn't stop. Well, isn't this just a continuation of the 97, for purposes of the 1997? I'm only talking about for purposes of known loss. I'm not talking about the policy. Because we removed the complaint. If you look at the complaint and if you look at the demand letter, they cite three problems. They don't say you're using similar lighting and they don't say you're using, you know, any of it. They're saying you used, and let's turn, it's 67, and you can walk through. Let's take the first amendment complaint, which would be tab 67. Well, I'm just looking at the letter. Okay. Let's go to the letter. November 21, 1997 letter. Right. Okay. So you turn to that ER 67-6, and it says, oh, it starts in the second paragraph with what the problem is. The advertising slogan, unlock your body's potential, has been used by Soloflex. And then goes on to say we have a problem with that because you use it. Then at the bottom of that paragraph it says, in addition, you're similar visually and in content, but then it then particularizes the problem and says your performance, this is addressed to Mr. Potter, as the model in the full effects videotapes, utilizes the same movements. So the letter wasn't saying, listen, we have an old, we have a problem with the music that you're using. We have a problem with you using the lighting that you're using and all that. So the essence of this advertising campaign, the model, stripping off his shirt and then going to use the machine. I read this. You're trying to get us to read it in a very narrow way, which you succeeded in doing at the district court level. But I don't read it so narrowly. They're saying you're using the same model, the same movements, lifting up the shirt and taking it off, going to the machine. You can just read that right into it. So why are you saying that all they complained about were the few words that you changed? I'm not saying that. I'm saying there were three things. There were the two slogans and the use of Randy Potter. Okay. And specifically with respect to Randy Potter, there appeared to have been two fundamental complaints. One was removing the shirt in a distinct manner and the other was the likeness of Randy Potter himself. So I'm not saying that that wasn't an issue. The claims in the next paragraph, it says, your actions, you, Randy Potter, and Bowflex's actions constitute all these things. Unfair competition, copyright infringement, trademark infringement, misappropriation of trade dress under federal and state statutory income. Pretty broad. That's right. Number of claims there. Right. A broad number of legal theories, most of which were dropped. But, yeah, absolutely. I mean, they threw the book. Why didn't your clients tell Admiral about them? The broker advised them, but they didn't have to. I'm sorry? Because they were just trading from their insurer, it seems to me. No. It's really despicable behavior. Unless you're going to explain it, you've got a really poor situation. I can explain it. Whether you like my explanation, I don't know. They talked to the broker. The broker said this isn't a claim and you don't need to disclose it. Moreover, they're asking to disclose those claims against them. They don't do it. That's right. They engage in fraud and deception. No. Fraud is knowing misrepresentation. They didn't do that. The other thing is they are asked to disclose it and they say they are disclosing everything. They don't disclose it. Right. And a couple of other facts. It seems to me a terrible case to pursue. Your clients engaged in fraud, and now they're trying to get the insurer to pay for it. Absolutely not, Your Honor. Because here's a couple of facts that jump out at the record. They didn't disclose this to their existing carrier. Now, that would have been no. That would have been. They weren't going to claim it. Maybe they didn't have any coverage. I don't know. They did have coverage. CNA funded the defense. They didn't tell them about it. And the reason it would have been foolish not to tell their existing carrier about it because there are provisions in the policy that require disclosure. They didn't think it was an issue, rightly or wrongly. And the reason that the basis of that was the fact that they had received a demand letter from Soloflex four years earlier, which is in the record. How can a sophisticated business get a letter like that and not knowing that a claim has been made against them? That's ridiculous. Okay. Well, they, okay. They thought. They thought they could hide it. No. They thought it wasn't going to go anywhere. They thought, and the testimony of the CEO was, Soloflex had come to us before and complained about our ads. And they didn't pursue it? We wrote. We did exactly what we did this time. Our direct focus. They had their attorney contact their attorney and say, let's sit down and work it out. Did he work it out? And they worked it out. And so in the. Not this time. Well, he didn't follow up on this letter. Well, he wrote the letter and said, let's sit down and work it out. And nothing happened. Then hit it. And then nothing happened. Remember, Your Honor, this is a letter that comes out in November. The policy takes effect in March. This lawsuit isn't filed until May. This is not something that, rightly or wrongly, my client saw at the time. And they were just digging themselves a hole and hoping the insurance would cover them. No. There's. Now, that's an inference that a jury could draw. And if we were looking. It sounds like the district court made a mistake in there, because at a minimum, it looks like there's tribal issues of fact on the known laws. I would agree with you as to the 1997 advertisements. I would agree with you as to those. There is clearly notice to direct focus that there is something that there's a claim out there. And that would be analogous to the Hillhaven case that we cited you where the insured is actually writing a letter saying, look, we've got problems here. And it goes into pretty gruesome detail as to the problems and the damage to the property. And the Supreme Court reverses a summary judgment for the carrier in that case. And I think the 1997 ads are tribal. The question is, for today, is the 1998 ads. Now, there isn't a single case that's been cited to you that applies a known loss doctrine to conduct that starts after the policies took effect. And we can argue about how similar the conduct is. But the fact of the matter is direct focus removed the offending marks. They removed a few words. Let's be honest about it. A few words is everything in infringement. It's not infringement. It's not. If there were other allegations as to, okay, as to the look and the sound and all the other things. And there's nothing in here that those issues were a problem for direct focus or for a sole fix. This was an advertising campaign that continued on into 1998. It was part of the same ad campaign. No question. No question of that. I don't see why there's not a question of fact, even with respect to 1998. Because of the nature of the underlying liability. We thought, looking at this, that we had resolved the issue. Furthermore, there's no other problem with this is the mindset that we're talking about for a known loss has to be pre-policy issuance. These ads that were issued in August 1998 weren't even a gleam in anyone's eye when the policy was issued. In the 98 ads? Right. It's all the same. It's not. They look the same in most respects. In fact, they look the same in all respects other than some logos and stuff. However, they remove the allegedly infringing slogans. And I don't see how you can narrow it that way. When the second amended complaint for relief from Soliflex v. Govlex alleges trade dress, surely you're aware of the standard for trade dress infringement. Right. So how can you narrow the actionable items to a few words? Well, because when you look you have to take the whole look and feel. And when you look at their trade dress infringement in the first amended complaint, which is closer in time to the policy issue. The second amended complaint doesn't come out until later. I don't believe the allegations are different. I don't think so. In that respect. And what it says is we imitated. Yes, it's worded broadly, but also says what we're talking about are copying Soliflex's unlock your potential, unlock your body's potential and the body you've always wanted advertising slogans. Then it has a cursory, okay, creating lookalike advertisements. That's their, you know, that's their thing. And then it goes on in using the same model and similar visual images to advertise a similar exercise device and goes on from there. So, yes, in the trade dress, when we get to the complaint after the policy is issued, we have a broader test of liability. But the focus is, and the particularized focus is on the use of the slogans and on and using the similar model, Mr. Potter. It does allege in cursory terms that they're lookalike advertisements. There actually is nothing in this record, and this is another important thing, that shows that these were lookalike ads. There's nothing in the record that shows that they're lookalike ads. I saw them. They look alike. The direct focus ads to each other? Yes. Yes. No, that's not an issue, that they're similar. The issue I'm talking about, Your Honor, is there's nothing in that record that shows that the direct focus ads are similar or lookalike ads to the Solaflex ads. But you settled that lawsuit. This is a different lawsuit that involves the question of whether the 97 ads and the 98 ads look alike. It's relevant. For purposes of the known loss doctrine and for purposes of the first publication, we're under the policy. Right. For the known loss, what I'm saying is you're delving into the mindset of the insured, okay? Objective intent. That's right. And one of the factors is do we have any clear infringement here? There is absolutely no evidence in this record. Everything that they use to support their infringement claim is an allegation. But you have to have some credibility attached to it. If you look at those ads, you're going to stand up and say those two ads don't look alike? No, hang on. We're confusing apples and oranges. What I'm saying is if you had and you don't have the Solaflex ads and any of the direct focus ads, there's nothing here to say that they're lookalike, that they're similar, that they're confusingly similar. Why are we talking about the Solaflex ads? Because that goes to my client's subjective intent back in 97 and whether they would have thought, okay, assume they had thought about it at all, that making the changes that they did in August 1998 would lead to more liability. They should have thought about it. It just all looks like, at least with respect to known loss, looks like there might be a tribulation effect. But I want to talk to you about the advertising, the first publication rule under the policy provision. And as I understand it, your argument is that the policy language is ambiguous with respect to whether it has to be direct or simple. I mean, identical or similar. That's right. That's one of our two arguments. The other one, which the district court didn't buy, is it doesn't apply at all. Well, forget that. Talk about the one I want. All right. Talk about my question. Just focus on my question for a moment. All right. And I'm sorry. I missed the question. Your argument is that this provision is ambiguous. Is that right? Actually, my argument is that it is unambiguous in favor of us, but at worst case, it is ambiguous. Because what the key word is the word material. Right. And so what is material? And does that mean that the material has to be published before the policy took effect? I think the policy is unambiguous. Yes. The material has to be published before. Then you get to the next question. Is there a lurking ambiguity in here? Can similar statements be the same material? And that's something that could have been resolved. We cite you the focus insurance group case that involves a different version of this that actually says the exclusion applies to the same or similar material first published before. So there's a way to take this, and the insurance industries use that to take this out of an ambiguity. Our point is not only does it not clearly say that similarity is good enough, but it actually becomes a pretty unworkable standard to go to the jury and say, are these similar? Similar in what sense? Are we going and incorporating confusingly similar notions from trademark or trade dress infringement? I don't know. But the whole incorporating similar in when the policy doesn't have it makes for a lot of problems, one of which we identified in our hypothetical, which is you could lose coverage across the board in the situation where you have similar ads in two policy periods. The first period it's not alleged to be infringing, and the second it is. Now, if you apply the similar test, the insured loses under both policies. There's no infringement in policy period one, so no coverage. And there is infringement, alleged infringement, in policy two, but it's similar to the stuff in policy one. So you make of this language in the Ringler case, granted it's talking about a defamation claim, but it applies general defamation principles to that same policy provision. It says that they interpret the language of the policy exclusion head issue, which is this first publication, as barring coverage of republication of any identifiably defamatory material, and quotes, whenever the first publication of substantially the same material occurred before the inception of the policy period, without regard to whether or not the defamatory material is literally restated in precisely the same words. Right. What the Court's doing there is in trying to assess the meaning of the term material and says, we're going to consider whether it's the same material for purposes of the underlying defamation claim. And so don't we have to do the same thing for purposes of the underlying trade dress, copyright, misappropriation claims here? If you adopted the Ringler test, then you would look at this and you would say, is this the same material for purposes of infringement? That's right. Now, the problem, as you know, from our view at least, the problem is it's clearly not. We're trying different expressions. And the gist and the thrust of trademark and trade dress infringement are these things confusingly similar. Your focus is on the expressions of the idea, not the idea itself. So it's actually, in our view, a very difficult standard to incorporate into the copyright or trademark infringement context. If you interpreted it that way, would it be a tribal issue of fact here? No, because we have different expressions of the same idea. Thank you. I know you guys want to get out of here. I'm going to submit our cross-appeal issues on the briefs at this point. Let me just check. I'm going to sit down at this point unless you have other questions for me. Thank you. Thank you. Just a couple of quick points. I'd like to point out that the evidence in the record is not silent on whether the commercials continued. Again, the declaration of Mr. Larson, the attorney for Soloflex. Boflex did not cease using the commercials following the November 21st letter. Accordingly, Soloflex formalized its claims by filing suit in May of 1998. The evidence is that they did continue it. The primary contention and driving force of Soloflex's claim was the fact that Boflex misappropriated Soloflex's look and feel. I'd also like to point out that we believe that Boflex made a calculated business decision in the hopes that Soloflex wouldn't sue them. They calculated wrong. That's their calculation. Time Oil, which has been approved and adopted by our Washington Supreme Court in a number of cases, Time Oil might not have known as a certainty that it would be found liable for the continuation of the contamination. Nevertheless, before obtaining additional insurance which would cover that damage, public policy concerns and equitable principles dictate that Time Oil should have revealed the existence of the substantial probability that it would be required to pay response costs relating to the contamination. In Time Oil, they failed to advise their carrier when they took the policy out that they had a claim. This is no different. Boflex knew that it was at risk of being sued and failed to tell the insurance company. Let me ask you this. Do you think we could, with respect to the first publication rule, do you think we could fairly say, because let me preface my answer by saying we're sitting in diversity. We're looking at what Washington courts would do with respect to how they would interpret the first publication rule, the language of this particular policy provision. Do you think it's fair to say that the Washington Supreme Court would adopt the view articulated in the Ringler case? In light of their sort of generous interpretation. It generally favors insureds. Yes. The Washington Supreme Court is generous towards insureds. But Ringler points out and emphasizes that the construction of the exclusion to limit it to verbatim republications would render it meaningless because defamation doesn't always repeat itself exactly. And trade dress is exactly the same. Trade dress isn't going to repeat itself in an exact replication. What do you say about his argument that other policies, you know, the industry changed some of the language in the policies to make it clear? I'm not aware of that. They changed the language to specifically. I think if you look at the cases that we've cited on prior publication, you'll see that most, almost all of them are identical to Admiral's. There are some that have additional language as well. But I don't think there was a change. Okay. Thank you. Thank you. Direct focus is Admiral Sherriff's company. Should we take a brief recess? We'll take a brief recess and move on. Thank you. Thank you. All right. We'll take a Philips Oral Health Care.
judges: Noonan, Wardlaw, Paez